Filed 7/7/21  Irani v. Exxon Mobil Corp. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SHERRY IRANI et al., | B308353 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV00694) |
| v. | |
| EXXON MOBIL CORPORATION et al., | |
| Defendants and Respondents. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Maurice Leiter and David S. Cunningham III, Judges.  Affirmed.

Weitz & Luxenberg, Benno Ashrafi and Josiah Parker; Sharon J. Arkin, The Arkin Law Firm for Plaintiffs and Appellants.

Dentons US, Jayme C. Long, Justin R. Sarno, Alexander B. Giraldo; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Joshua S. Lipshutz and Joseph R. Rose for Defendants and

Respondents Exxon Mobil Corporation and ExxonMobil Oil Corporation.

King & Spalding, Peter A. Strotz and Anne M. Voigts for Defendants and Respondents Chevron Corporation, Chevron U.S.A. Inc., and Texaco Inc.

_____

Sherry Irani, Robert Bahram Irani, and Azar Behzadi (collectively, Irani plaintiffs) appeal from a judgment entered after the trial court granted the motions for summary judgment filed by defendants Chevron Corporation, Chevron U.S.A. Inc., and Texaco Inc. (Chevron defendants), and Exxon Mobil Corporation and ExxonMobil Oil Corporation (Exxon defendants). The Irani plaintiffs brought wrongful death and survivor claims (including causes of action for negligence, premises liability, and loss of consortium), alleging their deceased father Ali Irani[1] contracted mesothelioma caused by exposure to asbestos while he was an Iranian citizen working for the National Iranian Oil Company (NIOC) from the late 1950s to the late 1970s in facilities controlled by defendants.[2] The trial court concluded the Chevron and Exxon defendants did not owe a duty of care to Irani.

On appeal, the Irani plaintiffs contend the Chevron and Exxon defendants owed Irani a duty of care based on their

_____

[1] To avoid confusion, we refer to Ali Irani as Irani and Sherry Irani by her first name.

[2] It is undisputed that mesothelioma is a cancer associated with exposure to asbestos.

2

predecessors' control over the Abadan refinery in which Irani worked and a 1954 contractual agreement between the Iranian government and a consortium of international oil companies, including defendants' predecessors (the Agreement). The Irani plaintiffs also assert the Chevron and Exxon defendants, through their predecessors, owed a duty to protect refinery workers like Irani from asbestos exposure based on a special relationship between the predecessor companies and the refinery workers arising from the Agreement. Alternatively, Irani contends the Chevron and Exxon defendants owed refinery workers a duty of care, arising from a special relationship between defendants' predecessors and the companies that operated the refinery.

During the pendency of this appeal, we decided *Sabetian v. Exxon Mobil Corporation* (2020) 57 Cal.App.5th 1054, 1075-1076 (*Sabetian*), in which we held defendants' predecessors[3] did not owe a duty of care to protect refinery workers from asbestos hazards at the Abadan refinery. We concluded neither the Agreement nor the plaintiffs' evidence was sufficient to create a triable issue of fact that defendants' predecessors exercised direct control over day-to-day refinery operations. (*Id.* at pp. 1072-1075.) The Chevron and Exxon defendants likewise did not owe a duty of care to Irani, and we affirm.

---

[3]     *Sabetian* involved the same defendants who are parties to this action; the plaintiffs were a former Iranian refinery worker at the Abadan refinery, who later contracted mesothelioma, and his wife. (*Sabetian, supra*, 57 Cal.App.5th at p. 1060.)

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Agreement*[4]

In 1951 the government of Iran nationalized its oil assets, assuming control from the Anglo-Iranian Oil Company, which was majority-owned by the government of Great Britain.  In 1952 Iran formed NIOC to own and supervise all of Iran's oil assets. To afford access to global oil markets and avoid possible influence from the former Union of Soviet Socialist Republics, the United States "devised a plan for a consortium of Western corporations to support the Iranian Government in running its oil industry to increase access to global markets and revenues."[5]

In 1954 American oil companies Gulf Oil Corporation, Socony-Vacuum Oil Company, Inc., Standard Oil Company of New Jersey, Standard Oil Company of California, and the Texas Company, and European oil companies Anglo-Iranian Oil Company, Ltd., N.V. de Bataafsche Petroleum Maatschappij, and Compagnie Francaise des Pétroles (collectively, the consortium members) entered into the Agreement with Iran and NIOC. Defendants Chevron Corporation and Chevron U.S.A. Inc., are successors in interest to Standard Oil Company of California and Gulf Oil Corporation.  Defendant Texaco Inc., is the successor of the Texas Company.  The Exxon defendants are successors in

---

[4]    This discussion is based on undisputed facts taken from evidence submitted in connection with the summary judgment motions.

[5]    It is undisputed the Agreement principally covered the Abadan refinery.  Consistent with the practice of the parties, we use "Abadan refinery" to refer generally to the facilities covered by the Agreement.

4

interest to Socony-Vacuum Oil Company, Inc., and Standard Oil Company of New Jersey.

The Agreement consists of two parts, the first among the consortium members, Iran, and NIOC and the second among Iran, NIOC, and the Anglo-Iranian Oil Company, Ltd. Only part I is at issue in this case. The recitals for part I provided, "WHEREAS, both the Government of Iran and [NIOC] desire to increase the production and sale of Iranian oil, and thereby to increase the benefits flowing to the Iranian nation . . . , but additional capital, experienced management, and technical skills are required in order to produce, refine, transport and market . . . oil in quantities sufficient to effect this increase in a substantial amount . . . [¶] WHEREAS, the international oil [consortium members] are in a position and are willing to supply such capital, management and skills; and [¶] . . . are in a position to market substantial quantities of Iranian oil . . . throughout a large part of the world over a considerable period of time, to the mutual benefit of the Iranian nation and themselves . . . [¶] . . . the Parties are agreed that said companies should undertake the operation and management of certain of the oil properties . . . of the Government of Iran and [NIOC], including the Abadan refinery, as hereinafter set forth . . . [¶] [¶] . . . negotiations have been amicably carried out with the object of assuring to the Government of Iran and [NIOC], on the one hand, a substantial export market for Iranian oil and a means of increasing the material benefits to and prosperity of the Iranian people, and to the companies, on the other hand, the degree of security and the prospect of reasonable rewards necessary to justify the commitment of their resources and facilities to the reactivation of the Iranian oil industry."

Article 3, section A of the Agreement provided that to carry out the "functions of exploration, producing, refining, transportation and the other functions specified in" the Agreement, the consortium members incorporated the "Operating Companies" under the laws of the Netherlands. The Agreement defined the Operating Companies as the Iranian Oil Exploration and Producing Company (IOEPC) and Iranian Oil Refining Company (IORC). The consortium members incorporated a holding company, Iranian Oil Participants Ltd. (IOP), which wholly owned IOEPC and IORC. Each consortium member formed at least one wholly owned subsidiary, each of which purchased 7 to 8 percent of IOP's shares. In article 3, section A of the Agreement, the consortium members "jointly and severally guarantee[d] the due performance by the Operating Companies of their respective obligations under this Agreement."

Article 4 of the Agreement listed and "strictly limited" the "rights, powers and obligations of the Operating Companies as well as the nature and extent of the supervision to be exercised by Iran and NIOC . . . to what is clearly stated in this Article." (Art. 4, § J.) Section A, paragraph (1) provided IOEPC the right to explore, drill for, produce, extract, process, store, transport, and ship crude oil and natural gas. Section A, paragraph (2) provided for IORC to have the right to refine and process crude oil and natural gas produced by IOEPC.

Article 4, section F sets forth "[t]he obligations of the Operating Companies to Iran and NIOC." These obligations included the duty "to conform with good oil industry practice and sound engineering principles applicable and appropriate to operations under similar conditions in conserving the deposits of hydrocarbons, in operating the oilfields and refinery and in

6

conducting development operations." (Agreement, art. 4, § F, ¶ (1).) The Operating Companies were obligated "to carry on such exploration operations as are economically justifiable with a view to providing sufficient reserves to support the rate of production of oil" (*id.*, § F, ¶ (2)); "to maintain full records" and "accounts" of their activities (*id.*, § F, ¶ (3)); "to minimize the employment of foreign personnel" (*id.*, § F, ¶ (4)); and "to prepare in consultation with NIOC plans and programs for industrial and technical training and education and to cooperate in their execution . . . to replace foreign personnel as soon as reasonably practicable" (*id.*, § F, ¶ (5)). Article 4, section I further provided, "[T]he Operating Companies shall determine and have full and effective management and control of all their operations," subject to supervision of their operations by Iran and NIOC as set forth in sections F and G.

Article 5, section A of the Agreement stated, "Iran and NIOC undertake that neither of them, and no person other than the Operating Companies, shall at any time . . . carry out . . . any of the functions specified in [p]aragaphs (1) and (2) of Section A of Article 4 of this Agreement" (defining the rights of IOEPC and IORC to exploration, production, and refining). Article 7 of the Agreement granted the Operating Companies the right to "exclusive use" of certain lands owned by NIOC and Iran for "their operations under [the] Agreement."[6] Under Article 17 of the Agreement, NIOC retained authority over all "non-basic

---

[6]     It is undisputed NIOC owned and operated the Abadan refinery prior to execution of the Agreement, and the Agreement's grant of authority to the Operating Companies constituted a transfer of control over the functions in article 4 from NIOC to the Operating Companies.

operations," including medical and health services, industrial and technical training and education, and housing.

Article 18 provided consortium members "shall" purchase crude oil and "may" purchase natural gas from NIOC for resale in Iran for export. Consortium members were permitted to assign their rights and obligations to purchase crude oil and natural gas to their subsidiaries, referred to as "Trading Companies." Under article 20 of the Agreement, the consortium members guaranteed certain oil production and export quantities on an annual basis.

The Agreement contemplated a 25-year lifespan, but in 1973 Iran assumed operations from IORC and IOEPC. IORC's employees were transferred to a new entity formed by NIOC, Oil Services Company of Iran, which assumed operation of the Abadan refinery.

B. *The Complaint*

The Irani plaintiffs filed this action on January 10, 2019 against the Chevron and Exxon defendants and others, alleging causes of action for negligence, strict liability, premises liability, negligent joint venture, alter ego, and loss of consortium. The complaint alleged each cause of action as a survivorship claim by Sherry as the successor in interest to Irani, and as wrongful death claims by the Irani plaintiffs as heirs to Irani. The complaint alleged the Chevron and Exxon defendants are the successors in interest to consortium members that were signatories to the Agreement. The complaint alleged the predecessors to the Chevron and Exxon defendants, as consortium members, contributed "capital, management and skills in the operation and management of the oil properties of [NIOC], specifically the . . . oil refinery in Abadan, Iran."

8

Further, the predecessor companies had "full and effective control of the [Abadan] refinery . . . in order to operate that refinery in conformity with good oil industry practice and sound engineering principles applicable to that industry."

The complaint alleged further Irani was exposed to products containing asbestos while he worked at the Abadan refinery and other Iranian facilities from approximately the 1950s to the late 1970s.  In January 2018 Irani was diagnosed with mesothelioma caused by his exposure to asbestos at these facilities.  Irani died the same month.

C.   *The Chevron and Exxon Defendants' Motions for Summary Judgment*

The Chevron and Exxon defendants separately moved for summary judgment.  They argued they owed no duty of care to Irani because they did not own, possess, or control the facilities in which Irani was alleged to have been exposed to asbestos.

The Chevron defendants filed a declaration of Frank G. Soler, the senior subsidiary governance liaison for Chevron Corporation, who stated the Chevron defendants' predecessors "did not ever own, lease, maintain, manage, control, or supervise" the Abadan refinery.  Soler averred a separate corporate entity facilitated requests from the Operating Companies to the consortium members "for skilled personnel."  Employees of the consortium members sent to work at the Abadan refinery were "seconded," meaning "their employment with the [consortium member] oil company terminated and such employees were then formally employed by IORC and/or IOEPC."

The Chevron defendants also filed a declaration of former Texaco Inc., employee Carter B. Conlin in which Conlin averred

9

he worked at the Abadan refinery from 1958 to 1963. At the refinery, Conlin supervised approximately 20 engineers, including "seconded employees" from other oil companies.[7] Conlin and the other seconded employees he supervised were "employed and paid by IORC for all work performed at the Abadan [r]efinery" and did not take direction or payment from "their past oil company employers or any oil company subsidiaries." The Chevron defendants filed excerpts of deposition testimony from Conlin in *Alkhas v. A.W. Chesterton Company* (Super. Ct. L.A. County, 2014, No. BC473745), in which he testified employees loaned by consortium members to IORC were thereafter treated as employees of IORC.[8]

D. *The Irani Plaintiffs' Opposition to Defendants' Motions for Summary Judgment*

The Irani plaintiffs opposed the Chevron and Exxon defendants' motions, arguing the Agreement and defendants' control over operations at the Abadan refinery created a duty of care owed by the Chevron and Exxon defendants to Irani to

---

[7] From 1958 to 1960, Conlin held the position of section head of the oil conversion processes section of the process engineering department for IORC at the Abadan refinery. From 1960 to 1963, he held the position of technical advisor for catalytic reforming in the refining operations department for IORC at the Abadan refinery.

[8] The Exxon defendants also relied on the Soler declaration and the Conlin deposition transcript filed by the Chevron defendants.

protect him from asbestos exposure.[9]  The Irani plaintiffs filed multiple declarations and excerpts of deposition testimony with their opposition.

Dr. Neill Weaver stated in his deposition in *Altimore v. Quigley Company, Inc.* (District Ct. Galveston County, Texas, 2013, No. 03CV0588) he worked from 1951 to 1973 as a physician for Esso Standard Oil Company, an Exxon predecessor.[10] Dr. Weaver identified a 1937 document entitled "Dust Producing Operations in the Production of Petroleum Products and Associated Activities," which made suggestions for control and suppression of asbestos dust.  When asked about Esso's asbestos practices, Dr. Weaver testified that when he began working in Esso's Baton Rouge, Louisiana refinery in 1951, "measures were in effect for the control of exposures throughout the refinery and the medical surveillance program for the workers potentially exposed to asbestos was in operation and had been in operation for decades."

Bruce Larson, who testified as Exxon Mobil Corporation's person most qualified in *Shahabi v. A.W. Chesterton Company* (Super. Ct. L.A. County, 2012, No. BC421531), was asked, "Do you agree that Exxon and Mobil had employees in high level

---

[9]     The Irani plaintiffs dismissed their strict liability, negligent joint venture, and alter ego claims before the summary judgment proceedings.  The Irani plaintiffs did not dispute IOP, IORC, and IOEPC each held regular meetings, maintained independent records, and had their own officers and directors.

[10]     Weaver testified he worked for Esso Standard Oil Co., which later became Exxon.  The Exxon defendants acknowledge previously doing business under the name Esso.  It is not clear from the record which consortium member Esso succeeded.

11

management at the Abadan refinery between 1955 and 1968?" He responded, "I think that's probably correct, yes." Larson also testified it was "certainly possible" that a person with management responsibility could cause work practices to be followed at the refinery, but he clarified that the Abadan refinery "had a patchwork of various jobs represented by Iranian nationals, various jobs represented by people from the participating companies, and . . . I don't really know how control was exercised in a situation like that." Larson testified he believed Exxon employees who worked at the Abadan refinery would be paid by the "holding company," not Exxon, and he was not aware of Exxon or Mobil "exercis[ing] any direct control over anybody" working at the Abadan refinery.

Testifying as Exxon Mobil Corporation's person most qualified in *Enayati v. A.W. Chesterton Company* (Super. Ct. L.A. County, 2009, No. BC400729), Larson testified he had no direct knowledge of the health and safety practices of the Abadan refinery during the period from 1954 to the 1980s. But he stated it had "always been at least the policy of Exxon and Mobil that . . . the same rules and regulations that apply domestically apply to overseas facilities. So I'm assuming that—and this is an assumption . . . [¶] . . . that comparable safety procedures and programs would be in place at [the Abadan] refinery as they would have been elsewhere." Larson affirmed he based his assumption on his experience with the standard operating procedures of the company.

Daniel Agopsowicz testified as the person most qualified for the Exxon defendants in his deposition in *Sabetian v. Air & Liquid Systems Corporation* (Super. Ct. L.A. County, 2018, No. BC699945). When asked whether the Exxon defendants

12

agreed "[i]t is part of good oil industry practice to ensure that the people on the refinery floor are kept safe," Agopsowicz replied, "Yes." When asked whether the Exxon defendants' predecessors "believe[d] at the time of signing [the Agreement] that [they] had an obligation to ensure that the Abadan [r]efinery was operated appropriately," Agopsowicz replied, "If they signed [the Agreement], then they would agree with this, yes."[11] Agopsowicz further testified the Exxon defendants' predecessors sent employees to work for the operating companies at the Abadan refinery, including Standard Oil of New Jersey's employee Paul Kuhl, who became general manager of the refinery.

Soler testified as the person most qualified for the Chevron defendants in *Sabetian v. Air & Liquid Systems Corporation, supra*, No. BC699945). Soler was asked in his deposition whether the statement made by Standard Oil of California (the predecessor of Chevron U.S.A., Inc.) in its 1964 annual report was true that "[t]he Iranian oil consortium has operated Iran's principal oil[] producing, refining, and transportation facilities for the past ten years." Soler responded, "It's a statement that was made by the company to stockholders."

The Irani plaintiffs also submitted a copy of a booklet entitled "Working with the Operating Companies in Iran 1958" (Iran booklet) issued by Socony Mobil Oil Company, Inc. (an affiliate of consortium member Socony-Vacuum Oil Company, Inc., the predecessor in interest to the Exxon defendants) to Socony's employee Charles Schroeder. Schroeder was transferred

---

[11] It appears from the question and answer that this testimony was in the context of questions about the Agreement. However, the record does not contain the prior page of the deposition transcript.

13

to Iran to work for the operating companies from 1958 to 1960. The booklet explained IORC and IOEPC had conducted "production and refining of oil in Southern Iran in accordance with the Agreement . . . . [¶] The joint Head Office of these two Operating Companies is located in Teheran, from which all activities of the Companies are directed." A section entitled "Terms and Conditions of Employment" stated, "Employees on loan assignment from a Member Company will remain employed by such Member Company but will be subject to these conditions for the period of their Company Service, unless otherwise provided in these conditions." The booklet further stated the operating companies would pay the salaries of "loan employees," with monthly deductions from the total salary paid for "Iranian income tax and electricity tax or for services provided by the [operating companies]," unless alternative arrangements were made between the Operating Companies and the consortium member or its affiliated company. With regard to "operational requirements," the booklet stated, "Whether he is directly engaged by the [Operating Companies] or on loan assignment from a Member Company, the employee shall give his whole time services to the [Operating Companies] . . . , in accordance with the orders and directions from time to time given to him by the [Operating Companies] . . . , and will work and reside in such places as the [Operating Companies] may from time to time require, and will abide by all applicable rules, regulations and other practices of the [Operating Companies] . . . from time to time in effect."

The Irani plaintiffs submitted excerpts of Conlin's deposition testimony in *Sarooie v. Asbestos Corporation Limited* (Super. Ct. L.A. County, 2015, No. BC529503). Conlin was asked,

14

based on the Iran booklet's statement that loaned employees "will remain employed" by the consortium member or affiliate company while on loan to the Operating Companies, whether Conlin was employed by Texaco when he worked for IORC at the Abadan refinery. Conlin responded, "It appears so, according to this definition." When asked whether this "was the same definition you were working under when you were in Iran," Conlin responded, "Yeah. The main two stipulations were that we would have the right to come back to a job of equal status, and that our benefit plans would remain in effect."

The Irani plaintiffs did not dispute the facts set forth in the Exxon defendants' undisputed material facts that Irani was "employed by" NIOC or IORC, and not by the Exxon defendants or their predecessors.[12] Nor did the Irani plaintiffs dispute "IORC conducted the 'basic' refining functions" at the Abadan refinery. The Irani plaintiffs also did not dispute that IOP did not play a role in Iranian oil refinery operations.

E.     *The Trial Court's Ruling and Entry of Judgment*

On February 28, 2020 the trial court[13] granted the Chevron and Exxon defendants' motions for summary judgment. In its

---

[12]     However, the Irani plaintiffs disputed the Exxon defendants' contention the Irani plaintiffs had not shown Irani was supervised, directed, or instructed by an employee of the Exxon defendants or their predecessors, and that the seconded employees "remained employed by the [c]onsortium member." The Irani plaintiffs cited to the Agreement, the Iran booklet, and the testimony of Agopsowicz, Conlin, and Larson.

[13]     Judge Maurice A. Leiter.

written ruling, the court[14] found the Agreement did not create a duty of care to Irani, and the Irani plaintiffs failed to raise a triable issue of fact as to whether defendants owned or controlled the Abadan oil refinery.[15]

On September 16 and 29, 2020 the trial court entered a judgment of dismissal in favor of the Chevron defendants and the Exxon defendants, respectively. The Irani plaintiffs timely appealed.

## DISCUSSION

A.    *Standard of Review on Summary Judgment*

Summary judgment is appropriate only if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*); *Delgadillo v. Television Center, Inc.* (2018) 20 Cal.App.5th 1078, 1085.) "'"""We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained."'" [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party."'""

---

[14]    Judge David S. Cunningham III entered the written order granting defendants' motions for summary judgment and the judgment of dismissal in favor of defendants.

[15]    By stipulation of the parties' counsel, the trial court did not rule on the evidentiary objections made by the parties. The parties do not renew their objections on appeal, and we do not consider them.

16

(*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; accord, *Valdez v. Seidner-Miller, Inc.* (2019) 33 Cal.App.5th 600, 607 (*Valdez*).)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff cannot establish an element of the cause of action or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; *Valdez, supra*, 33 Cal.App.5th at p. 607.) If the defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850; *Valdez*, at p. 607.)

B.     *Principles of Contract Interpretation*

"'The rules governing the role of the court in interpreting a written instrument are well established. The interpretation of a contract is a judicial function. [Citation.] In engaging in this function, the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed. [Citation.] Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. [Citations.]'" (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432; accord, *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195; *Sabetian, supra*, 57 Cal.App.5th at p. 1069.) "'Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. [Citations.]'" (*Brown v. Goldstein*, at p. 432; accord, *Sabetian*, at p. 1069.)

17

"The law has long distinguished between a 'covenant' which creates legal rights and obligations, and a 'mere recital' which a party inserts for his or her own reasons into a contractual instrument. Recitals are given limited effect even as between the parties." (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1101; accord, *Hunt v. United Bank & Trust Co.* (1930) 210 Cal.108, 115 ["Recitals or preambles prefixed to an agreement may or may not have binding force. If they form part of the operative covenants of the instrument in such a way as to show it was designed and intended that they should form part of it, they will be so construed."]; *O'Sullivan v. Griffith* (1908) 153 Cal. 502, 506 ["A covenant or warranty is never implied from a mere recital."]; *Sabetian, supra,* 57 Cal.App.5th at p. 1069.) However, "[i]f the operative words of a grant are doubtful, recourse may be had to its recitals to assist the construction." (Civ. Code, § 1068;[16] see *Sabetian,* at p. 1069; *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 38 [language labeled "recital" was actually covenant because it contained operative promise and recourse to language was necessary to identify real property subject to the agreement].)

---

[16]     All further undesignated statutory references are to the Civil Code.

C.   *The Irani Plaintiffs Failed To Raise a Triable Issue of Fact as to Their Negligence and Premises Liability Claims*[17]

   1.   *Duty of care*

"The elements of a negligence claim and a premises liability claim are the same:  a legal duty of care, breach of that duty, and proximate cause resulting in injury." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158 (*Kesner*); accord, *Castellon v. U.S. Bancorp* (2013) 220 Cal.App.4th 994, 998.)  "Recovery in a negligence action depends as a threshold matter on whether the defendant had "'a duty to use due care toward an interest of [the plaintiff's] that enjoys legal protection against unintentional invasion.'"" (*Southern California Gas Leak Cases* (2019)

---

[17]   The Chevron and Exxon defendants argue we should not reach the merits of the Irani plaintiffs' arguments on appeal because the law of the case doctrine applies to bar relitigation of the issues in light of the Court of Appeal's unpublished decision in *Malek v. Chevron U.S.A. Inc.* (Nov. 14, 2019, B270957) [nonpub. opn.] 2019 WL 6001030, noting the *Malek* case and this case were coordinated as part of *LAOSD Asbestos Cases.* (Nov. 14, 2019, B270957) [nonpub. opn.] 2019 WL 6001030.  ""'The doctrine of 'law of the case' deals with the effect of the *first appellate decision* on the subsequent *retrial or appeal*: The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.'"" (*Leider v. Lewis* (2017) 2 Cal.5th 1121, 1127.)  The Irani plaintiffs were not parties to the *Malek* appeal and, therefore, we do not apply the law of the case doctrine.

19

7 Cal.5th 391, 397; accord, *Sabetian, supra*, 57 Cal.App.5th at p. 1070.)

"Generally speaking, all persons have a duty to take reasonable care in their activities to avoid causing injury, though particular policy considerations may weigh in favor of limiting that duty in certain circumstances." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 209 (*Brown*); accord, *Regents, supra*, 4 Cal.5th at p. 619; *Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083 (*Vasilenko*).) As section 1714, subsection (a) provides, "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." "'[I]n the absence of [a] statutory provision declaring an exception . . . , no such exception should be made unless clearly supported by public policy.'" (*Brown*, at p. 217; accord, *Regents*, at p. 628 ["The court may depart from the general rule of duty . . . if other policy considerations clearly require an exception."]; *Kesner, supra*, 1 Cal.5th at p. 1143.)

In determining whether an exception to section 1714 applies, courts consider "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian* (1968)

20

69 Cal.2d 108, 113 (*Rowland*); accord, *Brown, supra*, 11 Cal.5th at p. 217; *Kesner, supra*, 1 Cal.5th at p. 1143.)

A defendant's control over property is sufficient to create a duty of care owed to persons using the property. (*Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1162, 1166 [affirming reversal of summary judgment because there were triable issues of fact as to landlord's control of strip of city land where landlord had "maintained the lawn . . . and, subsequent to the incident at issue, constructed a fence surrounding the entire lawn"]; *Sabetian, supra*, 57 Cal.App.5th at p. 1071; *Annocki v. Peterson Enterprises, LLC* (2014) 232 Cal.App.4th 32, 37 [trial court should have allowed plaintiff to plead that defendant restaurant failed to warn patrons leaving the restaurant that only a right turn could safely be made from its parking lot although accident occurred on adjacent roadway].)

"Premises liability "'is grounded in the possession of the premises and the attendant right to control and manage the premises'"; accordingly, "'mere possession with its attendant right to control conditions on the premises is a sufficient basis for the imposition of an affirmative duty to act.'"" (*Kesner, supra*, 1 Cal.5th at p. 1158; accord, *Taylor v. Trimble* (2017) 13 Cal.App.5th 934, 943-944 ["landowners are required 'to maintain land in their possession and control in a reasonably safe condition' [citations], and to use due care to eliminate dangerous conditions on their property"].) However, "[a] defendant cannot be held liable for the defective or dangerous condition of property which it did not own, possess, or control. Where the absence of ownership, possession, or control has been unequivocally established, summary judgment is proper." (*Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 134; accord, *Sabetian,*

21

*supra*, 57 Cal.App.5th at p. 1071; *Seaber v. Hotel Del Coronado* (1991) 1 Cal.App.4th 481 [hotel did not owe duty to patron who was struck and killed in a marked crosswalk outside hotel's entrance]; cf. *Vasilenko, supra*, 3 Cal.5th at p. 1085 [church had duty toward invitees who crossed public street to get to parking lot across the street because the church increased the invitees' exposure to the dangers of the street by placing and maintaining the parking lot on the other side of the street].)

"[S]ection 1714 does not . . . impose a presumptive duty of care to guard against any conceivable harm that a negligent act might cause." (*Southern California Gas Leak Cases, supra*, 7 Cal.5th at p. 399; accord, *Sabetian, supra*, 57 Cal.App.5th at p. 1071; *Dekens v. Underwriters Laboratories Inc.* (2003) 107 Cal.App.4th 1177, 1187-1188 [plaintiffs failed to raise a triable issue of material fact whether defendant "undertook the responsibility to guarantee [decedent's] safety from cancer-causing asbestos through its process of testing and certifying small appliances as safe from injury due to fire, electrical shock, or injuries from sharp protruding objects"].)

> 2.     *The Irani plaintiffs failed to raise a triable issue of fact as to the Chevron and Exxon defendants' ownership, possession, or control of the Iranian facilities*

The Irani plaintiffs acknowledge the central question is whether the Chevron and Exxon defendants (as successors to the consortium members) had active supervisory and management control over the Abadan refinery premises. The Irani plaintiffs do not dispute NIOC, and later Iran, not the consortium members, owned the facilities where Irani was exposed to

22

asbestos.  However, they contend the consortium members controlled the sources of asbestos at the Abadan refinery where Irani was exposed.  They also argue the Agreement created a duty of care by providing for the consortium members to create the Operating Companies, to ensure the Operating Companies would use "good oil industry practice[s]," and to promise to purchase oil for export and guarantee the production and exportation of specified quantities of oil.

As we concluded in *Sabetian*, "[T]he Chevron and Exxon defendants' commitments in the Agreement do not demonstrate their control over the Abadan refinery."  (*Sabetian, supra*, 57 Cal.App.5th at p. 1072.)  We observed, "Article 1 of the Agreement defined 'Operating Companies' by express reference only to IOEPC (the exploration and production company) and IORC (the refining company), to the exclusion of the separately defined term of '[c]onsortium members.'  The Agreement gave Iran and NIOC supervisorial authority over the Operating Companies, with IORC and NIOC sharing control of the Abadan refinery.  As discussed, IORC controlled the refining and processing of the crude oil and natural gas at the refinery (art. 4, § A, ¶ (2)) and NIOC controlled the 'non-basic operations,' including housing, medical and health services, and industrial and technical training and education (art. 17, §§ A, ¶ (1), B)."  Contrary to [plaintiff]'s assertion the Chevron and Exxon defendants' predecessors had effective control over the Abadan refinery, the Agreement expressly stated "'no person other than the Operating Companies, shall at any time . . . carry out . . . any of the functions'" of exploration, production, and refining, and the 'nature and extent of the foregoing rights, powers and obligations of the Operating Companies as well as the nature and extent of

23

the supervision to be exercised by Iran and NIOC shall be strictly limited to what is clearly stated in [article 4].'" (*Sabetian*, at p. 1072.)

We concluded that the consortium members' or their subsidiaries' ownership of 7 to 8 percent of the shares of IOP, which in turn owned IOEPC and IORC, was "not sufficient to create a duty of care as to refinery workers employed by the Operating Companies, . . . absent evidence supporting the piercing of the corporate veil based on the alter ego doctrine." (*Sabetian, supra*, 57 Cal.App.5th at p. 1072, citing *Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 [to pierce the corporate veil, a plaintiff must show "'(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow'"] and *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 220 ["Ordinarily a corporation is considered a separate legal entity, distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations."].)

Further, as in *Sabetian*, to the extent the consortium members controlled IOP, which owned the Operating Companies, the Irani plaintiffs never presented evidence to support liability of IOP as the parent corporation. (See *Sabetian, supra*, 57 Cal.App.5th at p. 1073, citing *Waste Management, Inc. v. Superior Court* (2004) 119 Cal.App.4th 105, 110 ["[A] parent corporation is not liable for injuries of a subsidiary's employee in the absence of evidence establishing a duty owed by the parent corporation to the employee."].) Here, the Irani plaintiffs dismissed their alter ego claims before the summary judgment proceedings.

In *Sabetian* we also rejected the plaintiffs' argument that the consortium members had the ability to intervene in refinery management to meet their obligations under the Agreement based on the consortium members' incorporation of the Operating Companies; their joint and several guarantee of the due performance of the Operating Companies to Iran and NIOC, including the commitment "'to conform with good oil industry practice'"; and their guarantee to Iran and NIOC of the production and exportation of certain quantities of oil. (*Sabetian, supra*, 57 Cal.App.5th at p. 1073.) Instead, the consortium members would satisfy their commitments under the Agreement by their creation of independent corporate entities (the Operating Companies) to provide the necessary day-to-day management and control of the Abadan refinery because "the Agreement tasked IORC and NIOC, not the consortium members, with refinery operations." (*Ibid.*) Further, "IORC's commitment to conform with good industry practice was explicitly stated in the Agreement as an obligation to Iran and NIOC, as were the consortium members' guarantees." (*Ibid.*)[18]

We also reviewed the deposition testimony submitted by the plaintiffs in *Sabetian* (also relied on by the Irani plaintiffs)

---

[18]    We also rejected the argument "defendants' control over the Abadan refinery is demonstrated by the recital language in the Agreement," concluding "the recital language referring to the willingness of the consortium members to provide their management abilities and their agreement to undertake the operation and management of the oil facilities was by its own terms limited by the specific provisions of the Agreement that vested responsibility for operation and control in the Operating Companies and NIOC." (*Sabetian, supra*, 57 Cal.App.5th at pp. 1073-1074.)

25

and concluded, "The testimony of Larson, testifying as Exxon Mobil Corporation's person most qualified, that 'there may have been some' Exxon or Mobil employees in high level management positions at the Abadan refinery is consistent with defendants' evidence that employees of consortium members who worked at the Abadan refinery were loaned to the refinery and under the control of and paid by IORC. For example, Soler, the senior subsidiary governance liaison for Chevron Corporation, declared that consortium members sometimes provided 'skilled personnel' to the Abadan refinery in response to requests from the Operating Companies, but these workers were then 'formally employed' by the Operating Companies, not their former consortium member employer. Similarly, Conlin, who in 1958 was an assistant chief design engineer employed by Texaco Inc., testified that from 1958 to 1963 he was seconded to work at the Abadan refinery, at which time he was employed and paid by IORC and took direction from IORC, not Texaco Inc., or other American oil companies. Further, Larson testified he was not aware of Exxon or Mobil 'exercis[ing] any direct control over anybody' working at the Abadan refinery." (*Sabetian, supra,* 57 Cal.App.5th at p. 25.)

Contrary to the Irani plaintiffs' contention in their reply brief, the additional evidence relied on by the Irani plaintiffs did not create a triable issue of fact that the consortium members had control over operations at the Abadan refinery. The Irani plaintiffs contend the Iran booklet establishes that employees loaned by the consortium members or their affiliates remained employees of the foreign company while working for the Operating Companies in Iran, distinguishing this case from *Sabetian.* The Irani plaintiffs also rely on Conlin's deposition

testimony in which he acknowledged that while he worked for IORC in Iran, he remained an employee of Texaco, as defined by the Iran booklet, explaining the "main two stipulations were that we would have the right to come back to a job of equal status, and that our benefit plans would remain in effect." However, the booklet also dictated the loaned employee would work "in accordance with the orders and directions from time to time given to him by the [Operating Companies] . . . and will abide by all applicable rules, regulations and other practices of the [Operating Companies] . . . from time to time in effect." This provision is consistent with Conlin's testimony that workers in the Iranian refinery did not take direction from "their past oil company employers or any oil company subsidiaries." Further, neither the booklet nor Conlin's testimony shows that employees of the consortium members who were seconded to the Abadan refinery as management employees were paid by the consortium members or their work was directed or controlled by the consortium members.[19] Nor does Agopsowicz's testimony Exxon's

---

[19] The Irani plaintiffs also rely on Agopsowicz's testimony in which he agreed that the Exxon defendants' predecessors "believe[d] at the time of signing [the Agreement] that [they] had an obligation to ensure that the Abadan [r]efinery was operated appropriately." But as we concluded in *Sabetian*, "[T]he consortium members' guarantees were to Iran and NIOC and fall short of evidence defendants exercised direct control of day-to-day operations at the refinery. Further, although Agopsowicz was designated as the person most qualified for the Exxon defendants, his testimony was not based on personal knowledge of the consortium members' intent in entering into the Agreement, but his reading of the Agreement." (*Sabetian, supra*, 57 Cal.App.5th at p. 1075, fn. 16.) The Irani plaintiffs take issue

27

predecessor sent its employee Paul Kuhl to work for the Operating Companies as general manager of the Abadan refinery create a triable issue of fact as to the predecessor company's control absent evidence Kuhl was directed or controlled by the predecessor company in his role as refinery manager.

The Irani plaintiffs' reliance on the holding in *Kesner, supra*, 1 Cal.5th 1132 is misplaced. In *Kesner*, the Supreme Court held that employers and premises owners have a duty to protect family members of on-site workers from secondary exposure to asbestos carried home on the bodies and clothing of the workers. (*Id.* at p. 1140.) The *Kesner* court started from the premise that under section 1714, "'the general duty to take

with the latter statement, contending that as the person most qualified Agopsowicz spoke for the Exxon defendants irrespective of his personal knowledge. However, the Irani plaintiffs do not provide any argument to rebut our conclusion in *Sabetian* that the guarantees by the predecessor companies to Iran and NIOC did not show their direct control of day-to-day operations at the Abadan refinery. We similarly reject the Irani plaintiffs' reliance on the statement of Chevron's predecessor to stockholders in its 1964 annual report that "[t]he Iranian oil consortium has operated Iran's principal oil[] producing, refining, and transportation facilities for the past ten years," and their reliance on the Exxon defendants' admission in their separate statement of facts that the consortium members "were to ensure the availability of 'sufficient oil and products' 'to market substantial quantities of Iranian oil . . . .'" In context, both statements refer to the consortium members' creation of the Operating Companies to operate and manage the Abadan refinery, their provision of seconded employees to the Operating Companies, and their ownership interest in IOP. This evidence fails to show defendants exercised direct control of the day-to-day operations at the refinery.

ordinary care in the conduct of one's activities' applies to the use of asbestos on an owner's premises or in an employer's manufacturing processes" (*Kesner*, at p. 1144), but it considered the *Rowland* factors to determine "'whether a categorical exception to that general rule should be made' exempting property owners and employers from potential liability to individuals who were exposed to asbestos by way of employees carrying it on their clothes or person." (*Id.* at p. 1145, quoting *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 774.) The *Kesner* court concluded it was "entirely foreseeable" that workers would bring asbestos dust home at the end of the day if adequate precautions were not taken, and, therefore, "[t]he foreseeability factors weigh in favor of finding a duty." (*Kesner*, at p. 1149.)

Unlike the allegations in *Kesner*, there is no evidence the Chevron and Exxon defendants operated or controlled the Abadan refinery or the sources of asbestos at the refinery, thereby imposing on them a duty under section 1714 to protect refinery workers like Irani from exposure to asbestos. (See *Isaacs v. Huntington Memorial Hospital, supra*, 38 Cal.3d at p. 134.) Irani was employed by NIOC and IORC on premises operated by NIOC and IORC. This is in contrast to the allegations at issue in *Kesner* that the defendant's predecessors were "engaged in active supervisory control and management of asbestos sources" at the workplace. (*Kesner, supra*, 1 Cal.5th at p. 1161.)

3. *The Irani plaintiffs failed to raise a triable issue of fact that the Agreement created a special relationship between defendants' predecessors and Irani*

The Irani plaintiffs contend the Chevron and Exxon defendants (through their predecessor companies) owed a duty to

29

protect refinery workers like Irani from asbestos exposure based on a special relationship between the consortium members and the refinery workers arising from the consortium members' guarantee in the Agreement of the Operating Companies' "due performance" under the Agreement, relying on *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799 (*J'Aire*). Under the Irani plaintiffs' argument, the Chevron and Exxon defendants owed a duty to the refinery workers because harm to refinery workers from asbestos exposure was reasonably foreseeable under the Agreement. Further, the Irani plaintiffs point to the Operating Companies' obligation "to conform with good oil industry practice and sound engineering principles." We rejected this argument in *Sabetian*, holding the *J'Aire* factors did not support imposition of liability on the Chevron and Exxon defendants.[20] (*Sabetian, supra,* 57 Cal.App.5th at p. 1075.)

---

[20] In their reply brief, the Irani plaintiffs criticize our analysis in *Sabetian*, arguing section 1714 establishes a presumptive duty to exercise ordinary care in one's activities and "*Sabetian* did not start from the presumption of a duty [of care] and determine whether, given that presumption, a categorical exception should be created." However, as we concluded in *Sabetian*, no duty of care arose under section 1714 because the plaintiffs failed to show the Chevron or Exxon defendants operated or controlled the premises where the asbestos exposure was alleged to have occurred. (*Sabetian, supra*, 57 Cal.App.5th at p. 1075 ["[T]here is no evidence the Chevron and Exxon defendants operated or controlled the Abadan refinery or the sources of asbestos at the refinery, thereby imposing on them a duty under section 1714 to protect refinery workers like Sabetian from exposure to asbestos."].) We therefore had no occasion to evaluate whether an exception to section 1714 applied.

30

"A duty running from a defendant to a plaintiff may arise from contract, even though the plaintiff and the defendant are not in privity. [Citations.] Under these circumstances, the existence of a duty is not the general rule, but may be found based on public policy considerations." (*Lichtman v. Siemens Industry Inc.* (2017) 16 Cal.App.5th 914, 921 (*Lichtman*) [company responsible for maintaining battery backup system for traffic signals owed duty of care to plaintiffs who were injured in traffic collision during power outage in which traffic signal stopped functioning]; *J'Aire, supra*, 24 Cal.3d at pp. 802, 804-805 [lessee who operated a restaurant alleged sufficient facts to state a cause of action for negligence to recover lost income from dilatory performance by contractor hired by owner of building to renovate restaurant]; *Biakanja v. Irving* (1958) 49 Cal.2d 647, 651 (*Biakanja*) [notary public who drafted a will for the decedent owed a duty of care to an estate beneficiary who was not in contractual privity with the notary public]; see generally *Aas v. Superior Court* (2000) 24 Cal.4th 627, 637-645 (*Aas*) [detailing evolving case law], superseded by statute on other grounds as stated in *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1079-1080.)

Under the balancing test articulated in *Biakanja* and *J'Aire*, in determining whether a duty of care arises from a contract in favor of a noncontracting party, the Supreme Court considered "[(1)] 'the extent to which the transaction was intended to affect the plaintiff,' [(2)] 'the foreseeability of harm to [him],' [(3)] 'the degree of certainty that the plaintiff suffered injury,' [(4)] 'the closeness of the connection between the defendant's conduct and the injury suffered,' [(5)] 'the moral blame attached to the defendant's conduct,' and [(6)] 'the policy of

31

preventing future harm.'" (*Southern California Gas Leak Cases, supra*, 7 Cal.5th at p. 401, citing *J'Aire, supra*, 24 Cal.3d at p. 804; accord, *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 838 (*Goonewardene*);[21] *Aas, supra*, 24 Cal.4th at p. 644; *Stewart v. Cox,* (1961), 55 Cal.2d 857, 863 (*Stewart*); see *Biakanja, supra*, 49 Cal.2d at p. 650.)

As we concluded in *Sabetian*, "the *J'Aire* factors do not support imposition of liability on the Chevron and Exxon defendants by virtue of the consortium members' guarantee in article 3 of the Operating Companies' performance of their obligations under the Agreement. Most significantly, under the first factor, the Agreement was not intended to affect . . . refinery workers, but rather, it was intended to accelerate Iranian oil production and exportation to the global market. Indeed, the obligations of the Operating Companies most relevant to protection of the refinery workers—to conform with good industry practice and prepare plans and programs for industrial and technical training and education—were specifically owed under the Agreement 'to Iran and NIOC.' [Irani] is unlike the plaintiff

---

[21] In *Goonewardene, supra*, 6 Cal.5th at page 838, the Supreme Court observed additional "policy considerations that may appropriately be considered in determining whether a tort duty of care should be recognized or imposed in the absence of privity of contract" included whether recognition of the duty of care "would (1) impose liability out of proportion to fault, (2) be unnecessary in light of the prospect of private ordering [of a product or service], and (3) would likely have an adverse effect on the availability of [a defendant's] services." Because the Irani plaintiffs have not argued that consideration of these additional factors supports finding a duty of care, we focus on the factors in the *Biakanja* and *J'Aire* balancing tests as briefed by the parties.

in *J'Aire*, a lessee whose restaurant business was interrupted by a contractor's renovations to improve the restaurant, or the plaintiff in *Biakanja*, the sole beneficiary of a will the notary public negligently failed properly to attest." (*Sabetian, supra*, 57 Cal.App.5th at p. 1078, citing *J'Aire, supra*, 24 Cal.3d at p. 804 and *Biakanja, supra*, 49 Cal.2d at pp. 648, 651.)

We reasoned in *Sabetian*, "Typically, as in *J'Aire* and *Stewart*, the first two *J'Aire* factors operate in tandem—because the underlying contract was intended to affect the plaintiffs, the harm to the plaintiffs as a result of the defendants' negligence was a fortiori foreseeable." (*Sabetian, supra*, 57 Cal.App.5th at p. 1078.) But we noted that "where a plaintiff is not entitled to maintain a breach of contract action based on the third party beneficiary doctrine, 'it would clearly be anomalous to impose tort liability, with its increased potential damages [citation], upon [the defendant] based upon its alleged failure to perform its obligations under its contract with plaintiff's employer.'" (*Id.* at p. 1079, quoting *Goonewardene, supra*, 6 Cal.5th at p. 840.) Here, as in *Sabetian*, Irani "was not a third party beneficiary of the Agreement because one of the three required elements is missing—that the 'motivating purpose of the contracting parties was to provide a benefit to the third party.'" (*Sabetian*, at p. 1079, quoting *Goonewardene*, at p. 830.)

We concluded the foreseeability of harm to refinery workers as a result of the consortium members' failure to protect refinery workers did not favor liability, because the Agreement vested exclusive power to control day-to-day refinery operations in IORC and IOEPC. (*Sabetian, supra*, 57 Cal.App.5th at p. 1079.) "The fact the consortium members committed to ensure the Operating Companies performed their obligations under the Agreement

33

does not mean the consortium members had the power to control the day-to-day activities of the refineries.  This is unlike the situation in *J'Aire*, in which the contractor had the ability to control the extent to which the tenant was harmed by the contractor's conduct under the agreement with the property owner.  (*J'Aire, supra*, 24 Cal.3d at p. 804.).)" (*Sabetian*, at p. 1079.)

As to the third factor, as in *Sabetian*, there is a high degree of certainty that Irani suffered injury due to his exposure to asbestos at the Abadan refinery.[22]  (*Sabetian, supra*, 57 Cal.App.5th at p. 1080.)  "But the fourth factor, the closeness of the connection between consortium members' conduct and [Irani]'s injury, is attenuated because IORC and NIOC, not the consortium members, controlled day-to-day refinery operations.  Likewise, the fifth factor, the moral blame attached to the consortium members' conduct, is weak," absent evidence of the consortium members' negligence in the execution of their contractual duties or that they had control over the operations that caused the harm.  (*Ibid.*)

"The sixth factor, the policy of preventing future harm, similarly does not favor [the Irani plaintiffs].  Because the consortium members were not in a position to control the day-to-day operations of the Abadan refinery, they were not in the best position to prevent future harm at the refinery.  Further, the Agreement acknowledged the consortium members were separate corporate entities from the Operating Companies, including

---

[22]  On appeal, defendants do not contend the Irani plaintiffs failed to raise a triable issue of fact regarding whether Irani's mesothelioma was caused by asbestos exposure at the Abadan refinery.

34

IORC.  We recognize the important public policy to require employers to provide a safe and secure workplace, but there is also a public policy recognizing the benefits of allowing companies to limit their business risks through the creation of a separate corporate entity." (*Sabetian, supra*, 57 Cal.App.5th at p. 1080.)  Here, the consortium members limited their risk by creating the Operating Companies.  Further, as noted, the Irani plaintiffs abandoned their argument in the trial court the consortium members were the alter egos of IOP or the Operating Companies.

The Irani plaintiffs' reliance on *Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1197 is misplaced.  There, a commercial subtenant was injured when he reached his arm through an electronic sliding gate to activate a switch to close the gate.  (*Id*. at p. 1198.)  The Court of Appeal concluded the defendant company that had repaired the gate for the property owner owed no duty of care to the subtenant to warn of design defects unrelated to the repairs performed by the defendant.  (*Id*. at pp. 1198-1199.)  The *Seo* court observed, however, that an independent contractor may owe a duty to a third party where it negligently performs a repair, fails to make a requested repair, or assumes the owner's duty to inspect and maintain the equipment and negligently fails to perform, leading to injury to the third party.  (*Id*. at p. 1206.)  Here, the Irani plaintiffs have not presented evidence showing defendants performed repairs, inspections, or maintenance or assumed the responsibility

assigned to IORC and NIOC under the Agreement to inspect or maintain the Abadan refinery.[23]

Finally, the Irani plaintiffs argue the predecessor companies were sureties of the performance by the Operating Companies by virtue of the predecessor's commitments in the Agreement, relying on sections 2787 and 2807.[24]  They argue the

---

[23]     *Mace v. United States* (N.D. Cal., Mar. 23, 2017, No. 15-CV-04060-LB) 2017 WL 1102736, relied on by the Irani plaintiffs, is distinguishable for the same reason.  In *Mace*, the National Park Service hired the defendant tree services company on two occasions to remove visible large seed pods from the park's trees.  (*Id.* at pp. *1-2.)  Nineteen months after the tree services company completed its second seed pod removal, a park patron was injured by a falling pod.  (*Ibid.*)  The tree services company moved for summary judgment, arguing it owed no duty beyond its contractual commitments to remove the seed pods.  (*Id.* at p. *6.)  The district court denied the motion, finding triable issues whether the tree service company had breached a duty of care to warn the National Park Service about the dangers of selectively pruning seed pods and to recommend safe pruning measures.  (*Id.* at p. *10.)  Unlike the tree services company in *Mace*, there is no evidence the predecessor companies performed any work for NIOC or the Operating Companies that gave rise to Irani's asbestos-related injury.  Under the Agreement, it was IORC and NIOC that assumed the duty to control refinery operations.  The Irani plaintiffs have provided no authority for the proposition a party that guarantees the performance of another assumes a duty to prevent harm to third parties caused by the performance.

[24]     Section 2787 provides in part, "A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor." Section 2807 states, "A surety who has assumed liability for

---

predecessor companies, as sureties, became liable to the Irani plaintiffs for the harm caused to Irani by the Operating Companies, which defaulted on their guarantee "to conform with good oil industry practice." This argument lacks merit. As discussed, "IORC's commitment to conform with good industry practice was explicitly stated in the Agreement as an obligation to Iran and NIOC, as were the consortium members' guarantees." (*Sabetian, supra*, 57 Cal.App.5th at p. 1073.) *Brunswick Corp. v. Hays* (1971) 16 Cal.App.3d 134, relied on by the Irani plaintiffs, is inapposite. *Brunswick* addressed a guarantor's liability to a creditor for the debts of the principal debtor. The Irani plaintiffs cite no authority for the proposition a guarantor is liable in tort for injuries to third parties caused by the conduct of the principal debtor. To the extent the predecessor companies were legally obligated under the Agreement for the default of the Operating Companies, the obligation was to Iran and NIOC, who stood in the position of creditors under the surety framework argued by the Irani plaintiffs.[25]

---

payment or performance is liable to the creditor immediately upon the default of the principal, and without demand or notice."

[25] The Irani plaintiffs also invoke section 3521, which provides, "He who takes the benefit must bear the burden." Section 3521 provides a "maxim[] of jurisprudence" to "aid in the[] just application" of the Civil Code, "not to qualify" its provisions. (§ 3509.) Among other things, this maxim underlies the doctrine of equitable estoppel (*In re Marriage of Bittenson* (2019) 41 Cal.App.5th 333, 338) and informs the interpretation of contracts. (See *Hearn Pacific Corp. v. Second Generation Roofing, Inc.* (2016) 247 Cal.App.4th 117, 119 [under § 3521 "an assignee's acceptance of the benefits of a contract

37

4.  *The Irani plaintiffs failed to raise a triable issue of fact that defendants' predecessors had a duty to protect Irani based on a special relationship between defendants' predecessors and the Operating Companies*

The Irani plaintiffs contend the predecessors to the Chevron and Exxon defendants owed a duty to Irani based on a special relationship the defendants had with the Operating Companies to protect Irani from the intentional misconduct of third parties. This contention lacks merit.

"A duty to control, warn, or protect may be based on the defendant's relationship with 'either the person whose conduct needs to be controlled or [with] . . . the foreseeable victim of that conduct.'" (*Regents, supra,* 4 Cal.5th at p. 619 ["a duty to control may arise if the defendant has a special relationship with the foreseeably dangerous person that entails an ability to control that person's conduct"]; accord, *Brown, supra*, 11 Cal.5th at p. 215 ["In a case involving harm caused by a third party, a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm."]; *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 [same].) "A special relationship between the defendant and the victim is one that 'gives the victim a right to expect' protection

_____

containing a fee clause, by bringing suit, constitutes an implied assumption of the attorney fee obligations, unless there is evidence the parties did not intend to transfer those fee obligations"].) The Irani plaintiffs cite no authority interpreting section 3521 to impose tort liability based on a contract for injuries to third parties.

from the defendant, while a special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.' . . . The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury. The law requires the defendant to use this position accordingly. [Citation.] [¶] Where the defendant has neither performed an act that increases the risk of injury to the plaintiff nor sits in a relation to the parties that creates an affirmative duty to protect the plaintiff from harm . . . the defendant owes no legal duty to the plaintiff." (*Brown*, at p. 216; accord, *Regents*, at p. 621.)

In *Regents*, the Supreme Court considered the "common features" of a special relationship. (*Regents, supra*, 4 Cal.5th at p. 620.) The Supreme Court observed, "Generally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection. . . . [¶] . . . The corollary of dependence in a special relationship is control. Whereas one party is dependent, the other has superior control over the means of protection. '[A] typical setting for the recognition of a special relationship is where "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare."'" (*Regents, supra*, 4 Cal.5th at pp. 620-621.) Further, "[s]pecial relationships also have defined boundaries. They create a duty of care owed to a limited community, not the public at large." (*Id.* at p. 621.) Finally, the court noted that "although relationships often have advantages for both participants, many special relationships especially benefit the party charged with a duty of care," identifying retail stores and hotels as examples. (*Ibid.*)

39

The *Regents* court concluded a college has a special relationship with its students, observing that college students are "dependent on their college communities to provide structure, guidance, and a safe learning environment" and "have superior control over the environment and the ability to protect students." (*Regents, supra*, 4 Cal.5th at p. 625.) However, the court limited the college's duty of care to "activities that are tied to the school's curriculum but not to student behavior over which the university has no significant degree of control," explaining the college would be expected to retain a "measure of control" over the classroom environment. (*Id.* at p. 627.)

Here, as discussed, the Irani plaintiffs failed to raise a triable issue that the Chevron and Exxon defendants retained any measure of direct control over the Operating Companies. As we observed in *Sabetian* in the context of our analysis of the *J'Aire* factors, the consortium members were not in the best position to prevent future harm at the refinery. (*Sabetian, supra*, 57 Cal.App.5th at p. 1080.) In the absence of a showing of defendants' authority to exercise control, the trial court properly granted summary judgment in favor of the Irani plaintiffs. (See *Barenborg v. Sigma Alpha Epsilon Fraternity* (2019) 33 Cal.App.5th 70, 75, 81 [national fraternity did not have special relationship with its local chapter and therefore had no duty to protect student who was injured at party held by local chapter, despite national fraternity's adoption of policies governing local chapter and ability to discipline chapter for policy violations because it had no ability to prevent injury].)

The Irani plaintiffs' reliance on our opinion in *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, affd. *Brown, supra*, 11 Cal.5th 204, is misplaced. There, we concluded the plaintiffs

had alleged facts sufficient to support a special relationship between the defendant taekwondo association and its registered taekwondo coach, and on that basis we concluded the taekwondo association had a duty to protect student athletes from sexual abuse by the coach. (*Brown v. USA Taekwondo*, *supra*, 40 Cal.App.5th at p. 1094.)[26] We reasoned that because the taekwondo association had control over the coach through its policies and procedures establishing requirements for coaches, it "was therefore ""in the best position to protect against the risk of harm"" and "'meaningfully reduce the risk of the harm that actually occurred.""" (*Ibid.*) Further, we found the *Rowland* factors supported "recognition of [the taekwondo association's] duty to use reasonable care to protect taekwondo youth athletes from foreseeable sexual abuse by their coaches." (*Brown v. USA Taekwondo*, at p. 1101.) However, we concluded the plaintiffs had not alleged facts sufficient to establish that the defendant Olympic Committee had a special relationship with the coach because the allegations did not establish the committee had the ability to control the coach's conduct or was in the best position to protect plaintiffs from the coach's sexual abuse. (*Id.* at p. 1102.)

Here, the record does not contain any policies and procedures or other evidence showing the predecessors to the Chevron and Exxon defendants had the ability to control the day-

---

[26] The Supreme Court in affirming our decision "express[ed] no view on the merits of the Court of Appeal's application of the special relationship test to either USAT or USOC. These fact-dependent issues fall outside the scope of the only question presented for our review." (*Brown, supra*, 11 Cal.5th at p. 213, fn. 4.)

to-day conduct of the Operating Companies in running the Abadan refinery, nor have the Irani plaintiffs presented evidence showing defendants' predecessors had the ability to control the asbestos products used at the Abadan refinery or were in the best position to protect Irani from asbestos exposure. As discussed, it was NIOC that owned the refinery and IORC that operated the refinery, without any direct control by the predecessor companies.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to recover their costs on appeal.


FEUER, J.


We concur:



PERLUSS, P. J.



McCORMICK, J.*

---

\*     Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.